So Ordered.

Dated: January 15, 2021



G. Michael Halfenger
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

Living Epistles Church of Holiness Inc.,   Case No. 19-25789-gmh
                                                    Chapter 11

Debtor.

**OPINION ON DISMISSAL FOR CAUSE AND
REPORT OF POSSIBLE CRIMES TO UNITED STATES ATTORNEY**

This case was commenced on June 12, 2019, when the debtor, Living Epistles Church of Holiness Inc., filed a voluntary petition under chapter 11 of the Bankruptcy Code. On December 28, 2020, the court dismissed the case for cause, including gross mismanagement of the estate. The following is an opinion explaining the reasons for dismissal and a report for investigation of possible bankruptcy crimes to the United States Attorney for the Eastern District of Wisconsin.

I

At the outset of this case, in June 2019, the debtor, with the court's approval, employed Leonard Leverson of Leverson Lucey & Metz S.C. as counsel. Over a year later, in August 2020, Mr. Leverson filed a motion to withdraw from representing the

debtor and requested an expedited hearing on and prompt adjudication of the motion.

In support of his requests, Mr. Leverson filed a declaration stating as follows: The debtor, by its principal, Pastor Terry Taper, made repeated misrepresentations to the court, the United States trustee, and creditors about the amount of rent paid by Demaryl Howard to operate a daycare center in facilities owned by the debtor. Mr. Howard reported paying $13,000 a month in rent, contrary to the monthly operating reports that the debtor filed with the court, which "consistently reflected that the Debtor received $2,500 a month in rent" for the property. ECF No. 132, at 3, ¶11. Pastor Taper, Mr. Leverson averred, described "the additional $10,500 payment every month" as "a charitable contribution to T & J Ministries". *Id.* at 4, ¶13. Mr. Howard told Mr. Leverson "that the instructions to pay $2,500 a month to the Debtor and $10,500 a month to T & J Ministries came from Pastor Taper" but that the $13,000 that he paid each month was "rent . . . . for the privilege of occupying the . . . Property". *Id.* at 5, ¶¶14 & 15. Mr. Leverson informed Pastor Taper of his "duty to correct false information . . . provided to the bankruptcy court" and "advised Pastor Taper . . . to . . . prepar[e] corrected monthly operating reports" and to "hav[e] T & J Ministries deposit into the Debtor's debtor-in-possession account the sums it had been paid." *Id.* at 4 & 5, ¶¶14 & 15. In response, "Pastor Taper reiterated that the $10,500 a month was a charitable contribution", called Mr. Leverson "a racist", "said that he had made a mistake in hiring [Mr. Leverson]", and said that "he wanted to obtain other counsel for the Debtor." *Id.* at 5, ¶16. Soon thereafter, Mr. Howard emailed Mr. Leverson to report that Pastor Taper "ha[d] made a threat out of retaliation to remove . . . equipment [from] the daycare . . . and turn off the water to the building" unless Mr. Howard told Mr. Leverson "that [he] made the payment of $10,500 as a donation." *Id.* at 5, ¶17. Mr. Leverson then spoke with Mr. Howard, who "told [him] that Pastor Taper was demanding rent of $13,000" within two days. *Id.*

The court promptly entered an order granting Mr. Leverson's motion to

withdraw as counsel and requiring the debtor and Pastor Taper to show cause in writing why the court should not dismiss the case and report the conduct described in Mr. Leverson's declaration to the United States Attorney for investigation of possible bankruptcy crimes.

The debtor employed Jonathan Goodman to replace Mr. Leverson as its counsel, responded to the court's order, and objected to dismissal and the court's reporting Pastor Taper to the United States Attorney. In these filings, the debtor indicated that it would be able, at an evidentiary hearing, "to show . . . that all funds received from . . . [Mr.] Howard, or the daycare . . . , were applied to the Debtor or for the Debtor's benefit", ECF No. 148, at 1, ¶1, and "to prove that any funds of the Debtor that were deposited in the T&J Ministries account[] were used for the purposes of the Debtor and not for the personal purposes of Pastor Terry Taper", ECF No. 149, at 1, ¶1. The debtor also alleged that it was Mr. Howard who "suggested . . . that the rent payments be bifurcated", ECF No. 148, at 1, ¶2, and argued that it would not be in the best interests of the debtor or the creditors to report Pastor Taper to the United States Attorney, ECF No. 149, at 1, ¶2. Finally, the debtor defended Pastor Taper, asserting that he "acted honestly, albeit perhaps inappropriately", by "taking possession of Debtor's funds, rather than . . . deposit[ing those funds] in the Debtor's account." ECF No. 149, at 1, ¶2.

On September 9, 2020, the court commenced an evidentiary hearing on dismissal, a report to the United States Attorney, and a related motion by the debtor to sell the real property of the estate that Mr. Howard was renting to someone other than Mr. Howard. The United States trustee appeared through counsel in support of dismissal. The court continued the evidentiary hearing on September 24, when the United States trustee concluded his case-in-chief; September 30, when the debtor concluded its case-in-chief; and October 6, when the parties gave closing arguments. The witnesses called by the parties and the exhibits offered and admitted in evidence are specified in the court's minutes and orders. See ECF Nos. 156, 162, 167 & 172. At the conclusion of the

evidentiary hearing on October 6 the court took these matters under advisement.

On December 28, based on the evidence presented, the court dismissed the case for cause, including gross mismanagement of the estate, under 11 U.S.C. §1112(b), and concluded that 18 U.S.C. §3057(a) requires that the facts and circumstances of the case be reported to the United States Attorney for further investigation of possible bankruptcy crimes by Pastor Taper. This opinion describes the grounds for those rulings and the evidence on which those rulings are based.

II

Section 1112(b) provides for dismissal of a case under chapter 11 of the Bankruptcy Code "for cause". Section 1112(b)(4) contains a non-exhaustive list of what constitutes "cause" for purposes of §1112(b). §1112(b)(4) ("For purposes of this subsection, the term 'cause' includes . . . ."); see 11 U.S.C. §102(3) ("In this title . . . 'includes' and 'including' are not limiting . . . ."). That list includes "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation", "gross mismanagement of the estate", and "unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter". §1112(b)(4)(A), (B) & (F).

The enumerated grounds for dismissal of a chapter 11 case, including those expressly stated above, generally focus on the postpetition conduct of the debtor. This makes sense, as a chapter 11 debtor is ordinarily a "debtor in possession", meaning that, subject to certain exceptions that do not apply here, the debtor has "all the rights . . . and powers" of a chapter 11 trustee. 11 U.S.C. §§1101(1) & 1107(a). These rights and powers include the right to "operate the debtor's business", which brings with it the right to "enter into transactions, including the sale or lease of property of the estate," and "use property of the estate in the ordinary course of business without notice or a hearing" and the right to "obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable . . . as an administrative expense." 11 U.S.C.

§§363(c)(1), 364(a) & 1108.

But a debtor in possession is also broadly required to "perform all the functions and duties . . . of a trustee serving in a case under" chapter 11. §§1101(1) & 1107(a). The duties of a chapter 11 trustee include "be[ing] accountable for all property received"; "furnish[ing] such information concerning the estate and the estate's administration as is requested by a party in interest"; and "if the business of the debtor is authorized to be operated, fil[ing] with the court . . . periodic reports and summaries of the operation of such business, including a statement of receipts and disbursements, and such other information as the United States trustee or the court requires". 11 U.S.C. §704(a)(2), (7) & (8); see 11 U.S.C. §1106(a)(1) (requiring a chapter 11 trustee to "perform the duties . . . specified in paragraphs (2), (5), (7), (8), (9), (10), (11), and (12) of section 704(a)").

Proper performance of these functions and duties ensures "disclosure and transparency", which are essential to the proper functioning of the bankruptcy system. See, e.g., *In re Visicon Shareholders Tr.*, 478 B.R. 292, 311 (Bankr. S.D. Ohio 2012). This is especially so where, as here, the debtor remains in possession and the court, the United States trustee, and the creditors necessarily must depend on the debtor's managers to competently conduct its affairs and comprehensively report its activities, including its receipts and disbursements. "Indeed, the willingness of courts to leave debtors in possession 'is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.'" *CFTC v. Weintraub*, 471 U.S. 343, 355 (1985) (quoting *Wolf v. Weinstein*, 372 U.S. 633, 651 (1963)); *Wolf*, 372 U.S. at 649–50 ("[I]n practice these fiduciary responsibilities fall not upon the inanimate corporation, but upon the officers and managing employees who must conduct the Debtor's affairs under the surveillance of the court.").

Even accepting, for the moment, the truth of Pastor Taper's testimony—that is, temporarily putting aside substantial concerns as to his credibility as a witness and the reliability of his testimony, which are discussed below—it shows that he, as principal

for the debtor in possession, failed to carry out the fiduciary responsibilities of a trustee.

Pastor Taper testified in relevant part as follows: In 2018 the debtor agreed to lease its real property for use as a daycare in exchange for monthly payments of $13,000. See Ex. 118, ECF No. 158-1, at 40–44. For at least the 8 months immediately prior to the filing of the petition, in June 2019, the debtor received $13,000 a month in payments for the use of the property, consistent with the terms of the lease. Once the petition was filed, the debtor started receiving $2,500 a month in payments on the lease and the remaining $10,500 owed to the debtor each month was instead paid in the form of a donation to T & J Ministries, "a support ministry" for the debtor established and controlled by Pastor Taper. ECF No. 160, at 01:12:04 to :46. Mr. Howard requested the split-payment arrangement from the outset because he "wanted a $10,500 write-off for his non-profit business", and Pastor Taper said, "I guess we can make that happen." ECF No. 160, at 01:06:05 to :24. That the parties did not implement Mr. Howard's preferred payment arrangement until around when the petition was filed was a coincidence. Despite the change, the full $13,000 each month was the debtor's money, so T & J Ministries used the $10,500 that it received each month (and its own funds from other sources) to pay the debtor's expenses, including tens of thousands of dollars to install a new roof on the debtor's main building and to repair or replace drywall, carpeting, and furnishings within the building that were damaged by water penetration while the case was pending. But neither the $10,500 each month that was owed to the debtor but donated to T & J Ministries nor the expenses of the debtor that were paid by T & J Ministries were disclosed in the debtor's monthly operating reports because the money was not deposited into or paid out of the debtor's bank account and Pastor Taper "didn't think it made any type of a difference". ECF No. 165, at 18:52 to 19:00.

Pastor Taper's testimony clearly shows that, whatever his intentions, throughout the pendency of this case, in his capacity as principal for the debtor in possession, he knowingly failed to report substantial expenses and regular income of the debtor that

was undoubtedly property of the estate. See 11 U.S.C. §541(a)(6). The debtor, acting through Pastor Taper, underreported its income by about 45%, on average, for most of the time this case was pending. See ECF No. 159-2 (showing that for the first twelve full months of the case, July 2019 through June 2020, the debtor reported average monthly income of less than $13,000). That the debtor's undisclosed income was used to pay its undisclosed expenses does not mitigate the lack of disclosure, as the debtor's counsel argued. To the contrary, that the debtor's undisclosed expenses exceeded its undisclosed income compounds the lack of disclosure. Pastor Taper concealed from the court, the United States trustee, and the debtor's creditors that, despite substantially more regular income than it was reporting, it was still unable to pay its expenses as they arose. This clear, repeated breach of the debtor's fiduciary duties as trustee is reason enough to dismiss this case for gross mismanagement of the estate.

Pastor Taper's testimony further shows that, by his actions, the debtor used property of the estate "other than in the ordinary course of business" without notice or court authorization as required by 11 U.S.C. §363(b)(1). See Fed. R. Bankr. P. 6004. Specifically, the costly repairs to and replacement of the roof on the debtor's main building and the drywall, carpeting, and furnishings within it could hardly be deemed ordinary-course expenses. At the least, these expenses do not appear in the only budget for the relevant time period that the debtor filed, in September 2019 with its motion for authority to use cash collateral and provide adequate protection. See ECF No. 19-1. Nevertheless, Pastor Taper testified that he used the debtor's undisclosed rents from real property of the estate to pay these unbudgeted, unusual, and undisclosed expenses while the case was pending, again breaching the debtor's clear duties as trustee.

Finally, Pastor Taper's testimony evinces a careless attitude toward accounting and the commingling of the debtor's funds with those of another entity he controlled. He conceded that on several occasions he paid expenses of the debtor in cash, contrary to the clear and repeated oral and written instructions of the United States trustee,

making it more difficult to account for the funds used to pay them and further exacerbating the debtor's failure to properly disclose its income and expenses and the use of estate property. Indeed, Pastor Taper could not even recall having received such instructions, despite compelling testimony to the contrary from an analyst with the United States trustee's office. When counsel for the United States trustee asked Pastor Taper, during the evidentiary hearing, "You would agree that bankruptcy is an important process, wouldn't you?", he testified, "Now, I would, yes." ECF No. 165, at 01:43:19 to :26. This testimony, given more than 15 months after the petition was filed, comes far too late and underscores that, throughout most of the pendency of this case, Pastor Taper did not take seriously the duties of a chapter 11 debtor in possession. Consequently, his many substantial breaches of those duties are, perhaps, not entirely surprising. Nevertheless, they amount to gross mismanagement of the estate and cause for dismissal of the case under §1112(b), as ordered.

III

In addition to dismissing this case, the court makes a report to the United States Attorney for an investigation of possible bankruptcy crimes. A judge who has "reasonable grounds for believing" that someone has violated any provision of title 18, chapter 9, of the U.S. Code—which specifies certain criminal acts in or related to a bankruptcy case—"or that an investigation should be had in connection therewith", must "report to the appropriate United States attorney all the facts and circumstances of the case, the names of the witnesses and the offense or offenses believed to have been committed." §3057(a). The relevant crimes include "knowingly and fraudulently conceal[ing] . . . from creditors or the United States Trustee, any property belonging to the estate of a debtor"; "knowingly and fraudulently receiv[ing] any material amount of property from a debtor after the filing of a case under title 11, with intent to defeat the provisions of title 11"; and, "after the filing of a case under title 11 . . . , knowingly and fraudulently conceal[ing] . . . [or] falsif[ying] . . . any recorded information . . . relating

to the property or financial affairs of a debtor". 18 U.S.C. §152(1), (5) & (8).

As already discussed, Pastor Taper's own testimony shows that he knowingly concealed property of the estate from the United States trustee and creditors and that he knowingly concealed or falsified recorded information relating to the debtor's property or financial affairs, including the debtor's monthly operating reports. Whether he acted fraudulently is a closer question, but one that need not be answered here because the evidence is sufficient to provide reasonable grounds for believing that he did and, thus, to warrant further investigation by the United States Attorney.

Mr. Leverson, who originally served as the debtor's counsel, testified about his communications, described in his affidavit, with Pastor Taper and Mr. Howard upon learning that the monthly operating reports he filed with the court on the debtor's behalf were inaccurate. Much of Mr. Leverson's testimony is hearsay, and the court does not rely on it to that extent. Notably, though, Mr. Leverson attested and testified that Pastor Taper refused to amend the debtor's monthly operating reports to accurately report the debtor's income and expenses, which led Mr. Leverson to conclude that Pastor Taper was perpetuating a fraud on the court. Mr. Leverson also attested and testified that Pastor Taper defended and insisted upon the characterization as "donations" of the $10,500 in monthly payments to T & J Ministries, which undermines the credibility of Pastor Taper's conflicting testimony (e.g., that it was Mr. Howard's idea to divert some of the monthly daycare-lease payments to T & J Ministries but that Pastor Taper always considered those payments to be money owed to the debtor).

Mr. Howard testified to both the statements attributed to him in Mr. Leverson's affidavit and additional details of his business relationship with the debtor and Pastor Taper. He testified that, in the summer of 2019, Pastor Taper told him to start splitting his $13,000 monthly payments on the daycare lease into a $2,500 payment to the debtor and a $10,500 "donation" to T & J Ministries and that Pastor Taper suggested this arrangement would be beneficial to him for tax reporting purposes but that he stopped

that practice because he knew the payments were not donations. He further testified that Pastor Taper threatened to turn off the utilities and remove equipment from the daycare property if he did not inform Mr. Leverson that the $10,500 monthly payments to T & J Ministries were, in fact, donations. The discrepancies between Mr. Howard's and Pastor Taper's testimony need not be resolved here. It is sufficient for present purposes to note that Mr. Howard's testimony, which was altogether credible, supports a reasonable inference that Pastor Taper knowingly and fraudulently falsified financial records and concealed property of the estate in violation of 18 U.S.C. §152.

Mr. Howard's testimony also illuminated one of the more puzzling aspects of the evidentiary record: it contains two commercial lease agreements with the debtor for the use of its real property as a daycare, and there is reason to believe that one of them is a fake. Exhibits 8 and 118 are respectively dated March 2, 2018, and April 5, 2018. Exhibit 118, which is cited and discussed above, provides for monthly payments of $13,000, it is signed by Mr. Howard's sister, and the parties do not dispute its authenticity. Exhibit 8, though, provides for monthly payments of $2,500, and it bears a signature attributed to Mr. Howard, but he credibly testified that he did not sign it. Indeed, he testified that he first saw exhibit 8 when his attorney showed it to him during the bankruptcy case. And the signature attributed to him on exhibit 8 does not substantially resemble the many exemplars of his signature in exhibit 9, which contains copies of checks that he made out to the debtor and T & J Ministries, that he authenticated in his testimony. Compare Ex. 9, ECF No. 159-1, at 2–14,[1] with Ex. 8, ECF No. 153-1, at 5. Mary Kay McSherry, an analyst with the United States trustee's office, testified that exhibit 8 was provided to her office by Mr. Leverson. Exhibit 118 was

---

[1] The debtor objected to the admission of exhibit 9 asserting that some portions of it are not relevant, and the court reserved ruling on the objection. See ECF No. 162, at 2. Exhibit 9 is relevant to the extent that it has a tendency to make it less probable that Mr. Howard signed the agreement admitted as exhibit 8, which is a fact of consequence, however minor. The debtor's objection to the admission of exhibit 9 is overruled, and exhibit 9 is admitted, to that extent only. The objection is otherwise sustained.

offered by the debtor. Mr. Howard's and Mr. Leverson's testimony about their discussions with Pastor Taper, viewed in light of the relevant evidence about exhibits 8 and 118, supports a reasonable inference that Pastor Taper created a fake lease agreement and provided it to the debtor's then-counsel to substantiate his assertion that the lease provided for monthly payments of only $2,500 and that the remainder of the actual monthly amount of $13,000 was a donation to T & J Ministries. This too supports a reasonable inference that Pastor Taper knowingly and fraudulently falsified financial records of the debtor and concealed property of the estate in violation of §152.

Finally, Pastor Taper's testimony about the financial affairs of T & J Ministries supports a reasonable inference that he was diverting funds from the debtor for personal reasons. He testified to various seemingly personal purchases using funds from the bank account of T & J Ministries, including for jewelry for his wife, life insurance, and personal trips. He also testified about certain other purchases that are, at a minimum, somewhat suspect, including a time-share package purportedly used by the debtor's parishioners and the costs associated with Pastor Taper's cross-country travel to "minister" and attend "Pentacostal conventions". The debtor's diverted lease income may well have gone toward expenses like these, for Pastor Taper's personal benefit, had the debtor's building not been substantially and unexpectedly damaged shortly after the case was filed, requiring the installation of a new roof and repair to or replacement of drywall, carpeting, and furnishings. In other words, it may have been mere happenstance that Pastor Taper was unable to spend for his personal benefit the property of the estate that he knowingly concealed by diverting it to T & J Ministries.

For these reasons, the court has reasonable grounds for believing that the United States Attorney for the Eastern District of Wisconsin should investigate whether Pastor Taper violated one or more of the provisions of title 18, chapter 9, of the United States Code, and hereby reports the facts and circumstances of the case, the names of the witnesses, and the offenses believed to have been committed, as required by §3057(a).

The clerk is directed to promptly mail a copy of this opinion and report to the office of the United States Attorney for the Eastern District of Wisconsin.

#####